UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

JOHN DOE,

   Plaintiff,

  v.

MOISES BECERRA, et al.,

   Defendants.

Case No. 23-cv-05327-RMI

**ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 1

   Now pending before the court is a Petition for Writ of Habeas Corpus (dkt. 1) filed by a person who has been civilly imprisoned by U.S. Immigration and Customs Enforcement ("ICE") for nearly two years, during the pendency of removal proceedings, but without a bond hearing on the basis of his prior criminal convictions. *See id*. at 2. Petitioner seeks either an order of release from this court, or an order directing his release within 21-days unless Respondents schedule a bond hearing before an immigration judge. *Id*. at 3. Respondents have filed a Response in Opposition (dkt. 10), and Petitioner has filed a Traverse (dkt. 12). Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the court finds this matter to be suitable for disposition without oral argument; and, to the extent stated herein, the Petition is granted.

## BACKGROUND

   Petitioner, G.C., is a 31-year-old wildland firefighter who has lived in the United States since he was brought here from El Salvador as a 9-year-old child without inspection, admission, or parole. *See* Pet. (dkt. 1) at 2, 10; *see* Opp. (dkt. 10) at 6. Petitioner's mother, his two sisters, his girlfriend, and a number of his extended family members – all U.S. citizens – live here. *See* Pet. (dkt. 1) at 8-9. Petitioner's childhood and upbringing took place under radically different

1  circumstances than those which many of us take for granted. Before his second birthday, his
2  mother reportedly left him in El Salvador in the care of a friend at whose hands he suffered from
3  some measure of violence. *Id*. at 9. During the ensuing years, between the ages of seven and nine,
4  Petitioner was sexually abused by his school-teachers, as well as by his caretaker's sibling and
5  teenage nephew. *Id*. At the age of nine, when Petitioner was brought to this country, he was
6  traumatized from the years of abuse, neglect, and physical and sexual abuse that had been the
7  hallmark of his life up to that point. *Id*. at 9-10. It therefore comes as little surprise that his
8  adolescent and teenage years were troubled and marked with substance-abuse and behavioral
9  issues.

As an adolescent and in his early teens, Petitioner "was arrested a couple of times as a juvenile for minor activities related to [his association with a] tagging crew, like vandalism and possession of spray paint, and he committed several petty thefts, stealing things like spray paint and other tagging supplies." *Id*. at 10. ICE became aware of Petitioner's troubles with the law – and, presumably, his immigration status – once he was cited for an episode of public consumption of alcohol in the Fall of 2013. *See* Opp. (dkt. 10) at 7. Consequently, ICE instituted removal proceedings shortly thereafter, during which it elected to release Petitioner on his own recognizance. *Id*. In March of 2014, just prior to his hearing in immigration court, Petitioner applied for relief under the Deferred Action for Childhood Arrivals ("DACA") program. *Id*. His DACA application was approved on January 2, 2015, for a period extending until January 1, 2018. *Id*. Accordingly, based on the approval of the DACA application, the immigration judge administratively closed the removal proceedings on May 19, 2015. *Id*.

During the period between January of 2015 and January of 2018 (that is, the DACA term), Petitioner experienced several more brushes with the law. In July of 2015, he was convicted of theft (under Cal. Penal Code § 484(A)), and he was sentenced to sixteen days of jail time and thirty-six months of probation. Opp. (dkt. 10) at 7. The following month, he was convicted of injuring a spouse/girlfriend (under Cal. Penal Code § 273.5(f)(2)), for which he was sentenced to two years in jail. Opp. (dkt. 10) at 7. Five months later, in January of 2016, he was convicted of driving under the influence of alcohol, whereupon he was sentenced to thirteen days in jail and

1    three years of probation. *Id*. In early June of 2018, he was convicted of assault by means of force

2    likely to produce great bodily injury (under Cal. Penal Code § 245(a)(4)), for which he was

3    sentenced to three years of imprisonment. Opp. (dkt. 10) at 7. A few weeks later, in late June of

4    2018, Petitioner was convicted of first-degree burglary (under Cal. Penal Code § 459), for which

5    he was sentenced to six years of imprisonment. Opp. (dkt. 10) at 7.

6        Midway during this period, in June of 2017, ICE ventured to reinstitute Petitioner's

7    removal proceedings; and, following the delays associated with his unavailability due to

8    imprisonment, in March of 2022, following completion of his criminal sentences, ICE arrested

9    Petitioner and held him in civil immigration custody at the Golden State Annex, then at Mesa

10   Verde, and then again at the Golden State Annex. *See id.*; *see also* Pet. (dkt. 1) at 14. As to his

11   current custodial status, Respondents submit that "Petitioner [has been] detained for removal

12   proceedings consistent with 8 U.S.C. 1226(c), which prohibits ICE from releasing certain

13   noncitizens with qualifying criminal history during their removal proceedings." Opp. (dkt. 10) at 7

14   (citing 8 U.S.C. § 1226(c)(1)).

15       In December of 2022, an immigration judge denied the Petitioner's application for deferral

16   of removal under Article III of the Convention against Torture ("CAT") and ordered the Petitioner

17   removed to El Salvador. Opp. (dkt. 10) at 8. The Board of Immigration Appeals dismissed the

18   ensuing appeal in May of 2023. *Id*. Thereafter, Petitioner filed a timely petition for review of his

19   removal order with the Ninth Circuit Court of Appeals and requested a stay of his removal order.

20   *Id*. By operation of Ninth Circuit rule, Petitioner has been protected from removal pending a

21   decision by the Ninth Circuit on the stay motion. *Id*. (citing Ninth Circuit General Order 6.4(c)).

22   The government represents that it has opposed Petitioner's stay motion, and that it will be able to

23   move forward with removal if the motion is denied. Opp. (dkt. 10) at 8.

## DISCUSSION

25       At the threshold, the government argues that the court lacks jurisdiction because the

26   Petitioner did not name his immediate custodian as the respondent because jurisdiction only lies in

27   one district – the district of confinement – to wit, the Eastern District of California. *See* Opp. (dkt.

28   10) at 8-15). As the government notes, Petitioner is confined in the Golden Gate Annex. *See id*. at

6. The Golden Gate Annex is a privately owned facility with which ICE contracts for the confinement of persons in immigration custody.[1] Noting that Petitioner has named four respondents – the ICE Field Office Director in San Francisco, the Secretary of Homeland Security, the Director of ICE, and the Attorney General – the government contends that none of these respondents is proper and that the only proper respondent is the warden of the Golden State Annex, given that that person is the Petitioner's immediate custodian. However, because the warden of the Golden State Annex (an employee of a private company) has no power to release Petitioner, has no legal or factual interest in the issues raised by the Petition, and cannot participate in any meaningful way in these proceedings, the government's argument is identical to one that this court has already rejected. *See Doe v. Barr*, 2020 U.S. Dist. LEXIS 74650, *11-17 (N.D. Cal. April 27, 2020). Thus, as the court explained in *Doe v. Barr*, the government's reliance on the immediate custodian rule is misplaced because:

> while in the great majority of habeas cases, or at least those which involve prisoners held in penal institutions, the immediate custodian rule makes sense, it cannot be argued with any seriousness that when the warden of a detention facility has no literal power to produce the petitioner, and cannot provide any meaningful answers to important factual and legal questions, that nevertheless courts should apply the immediate custodian rule and drive the litigation into a dead-end for no legitimate reason and to the benefit of no party. Lastly, it should not go without mention that by detaining immigration prisoners in remote jail facilities belonging to various counties [or private corporations] and then urging the application of the immediate custodian rule, it at least appears that Respondents may be attempting to take advantage of the immediate custodian rule to frustrate Petitioner's effective access to habeas corpus litigation. In short, Respondents' argument regarding this inappropriate application of the immediate custodian rule seeks to place Petitioner in a catch-22, where he can neither find habeas corpus jurisdiction in the district in which he is confined, nor elsewhere. Accordingly . . . because Respondent [Moises Becerra], the San Francisco Field Office Director for ICE, is both within this district and vested with discretionary authority to release Petitioner, he is a proper respondent, and the court concludes that the immediate custodian rule does not apply in this case and that at least one of the named Respondents can provide Petitioner with the requested discretionary relief. Thus, the government's argument that this court lacks jurisdiction over the Petition is without merit.

---

[1] *See* webpage for the Golden Gate Annex facility on the website of the GEO Group, Inc. https://www.geogroup.com/FacilityDetail/FacilityID/196

*Id.* at *16-17 (citing *Carmona v. Aitken*, No. 14-cv-05321-JSC, 2015 U.S. Dist. LEXIS 47772 at *17, 2015 WL 1737839, *2-*5 (N.D. Cal. Apr. 10, 2015) (reasoning that the immediate custodian rule did not apply to habeas petitions filed by an immigrant detainee; rather, the proper respondent should be one with actual authority to effectuate the prisoner's release, such as the Attorney General, or the Department of Homeland Security Secretary)).

As to the merits of the Petition, the government begins by submitting that Petitioner has not demonstrated that the circumstances of his detention render 8 U.S.C. § 1226(c) unconstitutional. *See* Opp. (dkt. 10) at 15-16. The government notes that "Petitioner argues for a set of standards that would render section 1226(c) unconstitutional in every case in this circuit where the Petitioner files a [petition for review] and requests a stay of removal." *Id.* at 16. Petitioner responds that he "is not raising a facial challenge; rather, he brings an as-applied challenge to prolonged detention *in his case*." Pet.'s Traverse (Dkt. 12) at 20 (emphasis in original). Specifically, Petitioner contends that his prolonged detention under § 1226(c), without any individualized bond hearing, violates procedural due process. *See generally* Pet. (dkt. 1) at 26-36.

The analysis here should begin with the observation that immigration detention must not be distinguished from any other form of civil detention because, citizen or not, civil commitment for any purpose constitutes a significant deprivation of liberty. *See Diaz v. Garland*, 83 F.4th 1177, 1180 (9th Cir. 2023) (citing *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011), citing *Addington v. Texas*, 441 U.S. 418, 427 (1979) ("To be clear, civil detention for any purpose constitutes a significant deprivation of liberty.")). Indeed, even where prolonged detention is permissible – as is the case with § 1226(c) – "due process requires 'adequate procedural protections' to ensure that the government's asserted justification for physical confinement 'outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Singh*, 638 F.3d at 1203 (quoting *Casas-Castrillon v. Department of Homeland Security*, 535 F.3d 942 (9th Cir. 2008), quoting *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)). As set forth below, courts in this circuit "previously applied the canon of constitutional avoidance to interpret other immigration provisions — 8 U.S.C. §§ 1225(b), 1226(c), and 1231(a)(6) — as providing [an implied] statutory right to a bond hearing once detention becomes prolonged." *Diaz*, 53 F.4th at

5

1196.

For example, in *Rodriguez v. Robbins*, 804 F.3d 1060, 1079, 1082 (9th Cir. 2015), the court of appeals had construed §§1225(b) and 1226(c) as imposing an implicit 6-month time limit on immigration detention under those sections, after which point, the government may continue immigration detention only under the authority of §1226(a), which the court "then construed [] to mean that an alien must be given a bond hearing every six months and that detention beyond the initial 6-month period is permitted only if the Government proves by clear and convincing evidence that further detention is justified." *See Jennings v. Rodriguez*, 583 U.S. 281, 291-292 (2018) (citing *Rodriguez v. Robbins*, 804 F.3d at 1085-87). In reviewing that approach, the Supreme Court noted that, in *Rodriguez*, the appellate court "all but ignored the statutory text [and] read *Zadvydas*, 533 U. S. 678 (2001), as essentially granting a license to graft a time limit onto the text of §1225(b)," that did not exist. *See Jennings*, 583 U.S. at 298. As set forth in *Jennings*, *Zadvydas* was focused on §1231(a) (which authorizes the detention of persons who have already been ordered removed from the country), where the Attorney General is directed to complete removal within a period of 90 days, during which period the person must be detained; however, after the 90-day period lapses, §1231(a)(6) provides only that certain persons "may be detained" while the removal process continues. *Jennings*, 583 U.S. at 298. Thus, *Zadvydas* construed §1231(a)(6) to mean that someone who has been ordered removed may not be detained beyond "a period reasonably necessary to secure removal," and that six months is a presumptively reasonable period, beyond which, if the detained person sets forth a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the government should either rebut that showing or end the detention. *See Zadvydas*, 533 U. S. at 699, 701.

Petitioner, however, is currently detained pursuant to the authority of § 1226(c). *See* Opp. (dkt. 10) at 6, 15-16. Section 1226(c) provides for mandatory detention of deportable persons who have previously committed various types of criminal offenses. *See generally* § 1226(c)(1)(A)-(D). As to any <u>statutory</u> basis for release from detention, in *Jennings*, the Court held "that §1226(c) mandates detention of any alien falling within its scope and that detention may end prior to the conclusion of removal proceedings 'only if' the alien is released for witness-protection purposes."

6

*Jennings*, 583 U.S. at 303-306; *see also* § 1226(c)(2) ("The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of title 18, United States Code, that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.").

More recently, in *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827, 1834-1835 (2022), the Supreme Court considered whether the text of §1231(a)(6) requires bond hearings after six months of detention in which the government bears the burden of proving by clear and convincing evidence that a noncitizen poses a flight risk or a danger to the community – the Court held that § 1231(a)(6) contains no such requirement. In rejecting Arteaga-Martinez's argument that *Zadvydas*, supports the idea that §1231(a)(6) implicitly incorporates the specific bond hearing requirements and burdens enumerated by the lower court in that case, the Court explained that "the detailed procedural requirements [grafted onto §1231(a)(6)] by the Court of Appeals below reach substantially beyond the limitation on detention authority recognized in *Zadvydas*. *See Arteaga-Martinez*, 142 S. Ct. at 1834. In short, in *Arteaga-Martinez*, the Supreme Court rejected the Third Circuit's attempt to do what the Ninth Circuit had done in *Rodriguez v. Robbins* – that is, to use the cannon of constitutional avoidance, and avoid a due process argument, to find that §1231(a)(6) *implicitly* incorporates specific bond hearing requirements and procedures, something which the Court explained that "*Zadvydas* does not require, and *Jennings* does not permit." *Arteaga-Martinez*, 142 S. Ct. at 1834. However, because the lower courts had not reached Arteaga-Martinez's due process arguments in support of a bond hearing in the immigration detention context – that is, because they agreed with him that the statute contained an *implied* right to a bond hearing – the *Arteaga-Martinez* Court stated that it would leave the constitutional arguments "for the lower courts to consider in the first instance." *Id*. at 1835; *see also Hernandez Avilez v. Garland*, 48 F.4th 915, 927 (9th Cir. 2022) ("Hernandez Avilez argued before the district court

1    that even if her detention was governed by Subsection C, she was entitled to habeas relief as a

2    matter of due process. The district court declined to reach this argument, and we make no

3    determination regarding the issue here. We leave this question to the district court to decide in the

4    first instance."); *see also Diaz*, 53 F.4th at 1201 ("an alien detained under § 1226(c) was subject to

5    that detention authority throughout the administrative and judicial phases of her removal

6    proceedings, and was therefore not entitled to a bond hearing under § 1226(c) as a statutory

7    matter. [] But we remanded the case for the district court to consider the petitioner's argument that

8    she was entitled to a bond hearing as a matter of due process.").

9          A number of courts in this district, having considered due process arguments similar to the

10   one Petitioner advances here, have granted habeas relief and ordered the government to arrange

11   for a bond hearing before an immigration judge. *See e.g., Doe v. Becerra*, 2023 U.S. Dist. LEXIS

12   155561, *15-23 (N.D. Cal. Sept. 1, 2023) (ordering that Petitioner must be provided with a bond

13   hearing before an immigration judge within 14 days from the date of the order, and mandating that

14   at that hearing, the burden shall be on the government to establish by clear and convincing

15   evidence that Petitioner is a flight risk or a danger to the community in order to continue his

16   detention); *see also Jimenez v. Current or Acting Field Off. Dir., San Francisco Field Off.*, 2024

17   U.S. Dist. LEXIS 29828, *17-28 (N.D. Cal. Feb. 1, 2024) (same); *Doe v. Becerra*, 2023 U.S. Dist.

18   LEXIS 180869, *6-19 (N.D. Cal. Oct. 6, 2023) (same); *cf. Rodriguez v. Nielsen*, 2019 U.S. Dist.

19   LEXIS 4228, *6-19 (N.D. Cal. Jan. 7, 2019) (granting habeas relief and ordering the government

20   to either release Petitioner from custody under an order of supervision or, within 60 days from the

21   date of the order, to afford him an individualized bond hearing before an immigration judge, but

22   not venturing to dictate the standard or burden of proof at that hearing).

23         As stated above, it is undisputed that Petitioner has been detained for nearly two years

24   pursuant to the government's statutorily mandated detention authority under § 1226(c). It is also

25   undisputed that during the time he has spent in Respondent's custody Petitioner has not been

26   afforded a bond hearing. Petitioner argues that his detention has become prolonged, and that his

27   ongoing prolonged detention without an individualized bond hearing violates his due process

28   rights. *See* Pet. (Dkt. 1) at 38. He contends that his entitlement to such a bond hearing is manifest

8

1  under the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). *See* Pet. (dkt.
2  1) at 29-32. Petitioner adds that his detention is likely to continue for many more months, if not
3  years, given his currently pending, though not fully briefed, case before the Ninth Circuit, and his
4  motion to reopen his proceedings before the Board of Immigration Appeals; thus, he submits that
5  there is no remotely certain end-date in sight regarding his custodial confinement. *See id*. at 35.
6  Respondents contend that Petitioner is lawfully detained under § 1226(c) and that "his time in
7  custody reflects on the considerable process that he has been afforded in being permitted to
8  continue to challenge his removal from within the United States." *See* Opp. (dkt. 10) at 16.
9  Respondent then adds that "even if the Court applies *Mathews*, it does not require a bond hearing
10 here . . . [because the] factors weigh against Petitioner's request for an individualized review in
11 this case." *Id*. at 18.

12 In *Mathews*, the Court explained that "the specific dictates of due process generally require
13 consideration of three distinct factors: [f]irst, the private interest that will be affected by the
14 official action; second, the risk of an erroneous deprivation of such interest through the procedures
15 used, and the probable value, if any, of additional or substitute procedural safeguards; and finally,
16 the Government's interest, including the function involved and the fiscal and administrative
17 burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S.
18 at 335.

19 As to the first factor, it does not require much to conclude that Petitioner has a compelling
20 interest – to say the least – in avoiding prolonged detention; it is equally evident that the
21 government's interference with that interest necessarily increases while Petitioner spends more
22 and more time in detention. *See e.g.*, *Diaz*, 53 F.4th at 1207 ("Rodriguez Diaz was detained for
23 fourteen months following his first bond hearing, we will assume that his detention qualifies as
24 'prolonged' in a general sense . . . [and hold that] an individual's private interest in freedom from
25 prolonged detention is unquestionably substantial."). The government submits that, as a "criminal
26 noncitizen . . . Petitioner is not simply asserting a right to be at liberty, but rather a right to be at
27 liberty *in the United States*, despite being subject to a removal order." Opp. (dkt. 10) at 19
28 (emphasis in original). This argument appears to be of questionable relevance to the analysis at

hand, however, because Petitioner has administratively and judicially challenged that removal order and, having spent nearly the entirety of his life in this country, his bases for challenging the removal order do not appear to be insubstantial. Further, the government also submits that the Supreme Court has never held that "criminal noncitizens have a constitutional right to be released from custody during the pendency of removal proceedings." *See id*. However, as explained above, the Supreme Court has expressly avoided ruling – one way or the other – on the lower courts' authority to order bond hearings, or even to issue release orders, for persons imprisoned pursuant § 1226(c), on due process grounds following an application of the *Mathews* test. Measurably more persuasive is the government's suggestion that "Petitioner's time in detention is in large part due to his own litigation choices," because "[w]hile Petitioner is free to exercise his legal rights to contest his removability, the Court should not consider the time he has chosen to take in pursuing relief as a factor weighing against the government in a *Mathews* analysis." *See id*. at 20. In *Rodrigues Diaz,* the court noted that "we cannot simply count [Petitioner's] months of detention and leave it at that." *Rodriguez Diaz*, 53 F.4th at 1207-08. Instead, courts must also consider the process a petitioner received during the time he or she was detained, the further process available, and "the fact that his detention was prolonged due to his decision to challenge his removal order." *Id* at 1208. In light of that, given that Petitioner has challenged his removal order, and given that Respondents have not afforded Petitioner a single individualized bond hearing during this period, the court finds that the first factor weighs in Petitioner's favor, but in light of the process available to petitioner during his confinement and the contribution to the delays in adjudicating his underlying removal proceedings caused by Petitioner's litigation choices, this factor will not be accorded overwhelming weight. That said, the court still views this factor as strongly weighing in Petitioner's favor given the fact that his natural interest in his personal liberty cannot be materially diminished by his decision to pursue avenues of administrative and judicial review to which he is unquestionably entitled. *See e.g.*, *Doe v. Becerra*, 2023 U.S. Dist. LEXIS 214687, *27-28 (N.D. Cal. Dec. 1, 2023) ("His interests in his physical freedom are not diminished because he chose to pursue entirely legitimate proceedings to which he is legally entitled.")

The second and third *Mathews* factors should be considered together. As to the second

1  *Mathews* factor – the risk of erroneous deprivation – the government simply states that "there is no
2  risk of an erroneous finding that Petitioner is subject to Section 1226(c); Petitioner does not
3  dispute that the mandatory detention provision of Section 1226(c) applies to him." Opp. (dkt. 10)
4  at 20. The government adds that "while Petitioner may not believe that detention is warranted for
5  someone like him, the fact remains that he is mandatorily detained under Section 1226(c) – a
6  procedure that Congress has specifically provided for and that the Supreme Court has held to be
7  reasonable." *Id*. at 21. As to the third *Mathews* factor, the government states that "mandatory
8  detention of criminal noncitizens under Section 1226(c) serves a legitimate government purpose in
9  that it allows the government to remove a criminal noncitizen upon completion of his removal
10 proceedings . . . [and] the government's interest in detention [is] to ensure a noncitizen's
11 appearance for removal proceedings and to protect public safety." *Id*. at 21. In short, the
12 government asserts that "[n]othing suggests that Petitioner's detention is for any other purpose
13 than to ensure his appearance at removal proceedings and prevent him from committing further
14 crimes." *Id*. at 22.
15      However, if the government's interests – that is, Petitioner's appearance at removal
16 proceedings and preventing him from committing any crimes – can be achieved *without* his
17 imprisonment, then the second and third *Mathews* factors would also clearly weigh in Petitioner's
18 favor in that he will have been erroneously deprived of his liberty to the benefit of no one.
19 However, without an individualized bond hearing (a process of which Petitioner has been
20 deprived), there is no way that such determination could be made, leaving only the impression that
21 Petitioner's imprisonment has been mechanistic and arbitrary rather than strictly necessary.
22      In other words, the government's interests can be protected just as well if Petitioner is
23 given an individualized bond hearing. This is so because if the immigration judge determines that
24 the Petitioner poses a risk of nonappearance or a danger to the community, then he will
25 presumably be denied bond and will remain in custody. If, on the other hand, it is determined that
26 his release does not present such risks, then the government's interests are still protected by virtue
27 of that finding. The only real difference between affording Petitioner a bond hearing before an
28 immigration judge and not doing so would be the administrative cost of providing the hearing.

When viewed in conjunction with the deprivation of Petitioner's liberty interest (given his two years of confinement), the administrative burden of conducting a bond hearing is negligible. As to the government's contention that "there is no risk of an erroneous finding that Petitioner is subject to Section 1226(c)" (*see id*. at 20), this argument misses the point because Petitioner has not challenged the applicability of the § 1226(c). Rather, he has challenged his prolonged custodial confinement without an individualized inquiry into whether or not his imprisonment is even necessary for the protection of the public and to ensure his appearance at removal proceedings. While it is true that his prior criminal convictions may be relevant to that inquiry, it cannot be reasonably contended, without any individualized consideration, that they would lead to a categorical presumption of flight risk or dangerousness – at least, for due process purposes. In short, the court finds that all three *Mathews* factors weigh in Petitioner's favor and that Petitioner should be granted an individualized bond hearing.

The government submits that if the court grants the Petitioner a bond hearing, the hearing should be before an immigration judge with the Petitioner shouldering the burden of proof. *See* Opp. (dkt. 10) at 22-24. The court agrees with the government that the bond hearing should be take place before an immigration judge. However, at that hearing the government shall bear the burden of proving by clear and convincing evidence that Petitioner's continued detention is warranted. *See Singh*, 638 F.3d at 1205. Notwithstanding the fact that when *Singh* determined the standard of proof that should apply in immigration bond hearings as a matter of constitutional law, courts in this circuit took the view that the hearings themselves were implicitly required by statute (a view that, as set forth above, has been rejected by the Supreme Court in *Jennings*). Given that *Singh*'s burden of proof holding was based on constitutional due process principles rather than any interpretation of the statute, that holding remains binding. *See id*. at 1203-04 ("[E]ven where prolonged detention is permissible, due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint . . . [and] [b]ecause it is improper to ask the individual to share equally with society the risk of error when the possible injury to the individual — deprivation of liberty — is so significant, a clear and convincing evidence standard

12

of proof provides the appropriate level of procedural protection.") (internal citations and quotation marks omitted).

## CONLUSION

The court **ORDERS** that on March 28, 2024, Petitioner shall be released from confinement on suitable conditions of release unless prior to that date the government provides him with a bond hearing before an immigration judge. At that hearing, for Petitioner's confinement to continue, the government must establish by clear and convincing evidence that he presents a *current* risk of flight or dangerousness such that no condition or combination of conditions short of detention could reasonably assure his appearance at removal proceedings or the safety of the community. If the government fails to meet this burden, the immigration judge shall order Petitioner released on appropriate conditions of supervision, taking into account his ability to pay a bond and any available alternatives to the payment of a monetary bond. If, on the other hand, the government meets this burden, the immigration judge shall issue a reasoned decision explaining why the government has met its burden of proof and why no condition or combination of conditions short of detention could reasonably assure his appearance at removal proceedings or the safety of the community. It is **FURTHER ORDERED** that the hearing, and the immigration judge's decision (if rendered orally), shall be transcribed.

**IT IS SO ORDERED.**

Dated: March 7, 2024

ROBERT M. ILLMAN
United States Magistrate Judge